**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BRIAN BEALS, | ) | |
| | ) | Case No. 24 CV 12713 |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Hon. Joan H. Lefkow |
| | ) | |
| v. | ) | Magistrate Judge Laura K. McNally |
| | ) | |
| JUDY KRIZEK, as Special Representative | ) | JURY DEMAND |
| for THOMAS PTAK, Deceased; MICHAEL | ) | |
| DUFFIN; PATRICK R. DOYLE, JR; | ) | |
| MICHAEL J. WILSON; and CITY OF CHICAGO, | ) | |
| A municipal corporation, | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S ANSWER, AFFIRMATIVE
DEFENSES, AND JURY DEMAND TO PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendant City of Chicago ("City"), by its attorneys, The Sotos Law Firm, P.C., for its

Answer, Affirmative Defenses, and Jury Demand to Plaintiff's First Amended Complaint, states

as follows:

**INTRODUCTION**

1. Brian Beals spent 35 years in prison for crimes he did not commit.

**ANSWER:** **The City admits, upon information and belief, that Plaintiff was incarcerated
approximately 35 years. The City lacks knowledge or information sufficient
to form a belief as to the truth of the remaining allegations contained in
Paragraph 1.**

2. Upon his release on December 12, 2023, The Cook County State's Attorney's

Office – the same office that once wrongfully prosecuted Brain – released the following

statement:

**Today, in a significant step towards justice, a Cook County court granted a**

**petition to vacate the conviction of Brian Beals, who was wrongfully convicted in 1988 of the murder of a six-year-old and injuring his mother and served 35 years in prison. This wrongful conviction represents a grave miscarriage of justice not only for Mr. Beals but also for the victims and their family, who have been denied true justice for decades.**

**ANSWER:** **Upon information and belief, the City admits that the Cook County State's Attorney's Office issued the statement quoted in Paragraph 2. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 2.**

3.     Brian Beals grew up in Englewood, went on to attend school at Southern Illinois University, and by all accounts was an all-around good guy with a bright future.  Around the neighborhood in Englewood, he coached Little League and could often be found playing football or catch with younger kids. Like much of his family, Brian was always one to do good and look out for others.  In fact, Brian aspired to become a police officer, just as his beloved family members went on to have lauded careers in the Chicago Police Department, the Chicago Public Schools, and in other noteworthy and accomplished fields.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 3.**

4.     All of this changed on January 24, 1990, when Brian was wrongfully convicted of murder and aggravated battery and was ultimately sentenced to 85 years in prison.  Brian's conviction arose out the shooting of six-year -old Demetrius Campbell and his mother, Valerie Campbell, on November 16, 1988.  Demetrius died from the gunshot wounds, while Ms. Campbell was injured but survived.  As described below, the Campbells were innocent bystanders, tragically in the wrong place at the wrong time.  In a very different way, so was Brian Beals.

**ANSWER:** **Upon information and belief, the City admits that on January 24, 1990, Plaintiff was convicted of murder and aggravated battery and sentenced to 85 years in prison, but deny that he was wrongfully convicted. Upon information and belief, the City further admits that Plaintiff was convicted for the shooting of six-year-old Demetrius Campbell and his mother, Valerie Campbell, on November 16, 1988. Answering further, upon information and belief, the City admits that Demetrius died from the gunshot wounds, while Valerie Campbell was injured but survived. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 4.**

5.      Everyone in the neighborhood knew that Brian did not – and could not—commit these heinous crimes.  There was no physical evidence connecting Brian to the shootings, or did he have any motive to commit them.  At the same time, there were numerous witnesses who confirmed that someone else shot the Campbells.  But truth and integrity meant nothing to the Chicago Police Department's notoriously corrupt detective, Thomas Ptak, his partner, Michael Duffin, and the other police officers involved in Brian Beals' malicious prosecution and wrongful conviction.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 5.**

6.      Knowing that Brian Beals was innocent, the Defendant CPD Officers and Detectives fabricated evidence, manipulated witnesses, buried evidence and information that would have exonerated Brian, and lied in official reports and on the stand at trial.  At the core of their misconduct was that they manipulated one of the victims, Valerie Campbell, into falsely identifying Brian Beals as the shooter.  Ms. Campbell was particularly vulnerable and susceptible to influence given that she had been shot and was holding her child when he was shot and killed, and the Defendant CPD Officers and Detectives took full advantage of her.  Through manipulation by the Defendant CPD Officers and Defendants, Valarie Campbell's story evolved

3

from, first, not identifying for the very first time to an undocumented, fanciful, and entirely false story about how she saw Brian Beals shoot her and then stand over her and her children in broad daylight for a matter of minutes before leaving the scene.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 6.**

7.      Fabricating evidence to support convictions was, after all, part of Defendant, as an institution, condoned, enabled, and rewarded its detectives and officers to manipulate witnesses, fabricate evidence, commit *Brady* violations, and engage in other unconstitutional conduct as a means to an end. That end, here, was the wrongful conviction of Brian Beals.

**ANSWER:**  **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 7.**

8.      Without the malicious and unconstitutional conduct of the Defendant CPD officers and Detectives, Brian Belas would never have been prosecuted or convicted; he would never have been ripped away from his family and suffered through the unimaginable horror of spending 35 years in prison as an innocent man; he would have never had his life, liberty, and tremendous potential taken from him; and he would never have the scars, the pain, and the trauma that results from being wrongfully accused and convicted of killing a child.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 8.**

9.      At the same time, however, Brian always maintained his innocence and always maintained his hope. While in prison, he poured himself into helping others. He taught fellow

inmates how to read and about civics.[1] He helped start the Dixon CC Theatre Workshop, a national award-winning theater program, which hosted concerts and roundtable discussion.[2] Brian himself wrote and co-authored multiple plays, including "Broken Pieces," which received an Honorable Mention award in PEN America's 2020 Prison Writing Contest[3], and "The Story of Violence," which won First Place in PEN America's 2023 Prison Writing Contest.[4] Brian also received an Honorable Mention award for a nonfiction essay entitled, "An Insider's Perspective of the IDOC's Creation and its Fundamental Failings."[5]

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9.**

10.    Now, after surviving a level of torment that no innocent person deserves and persevering through circumstances that would have caused many to lose hope and give up, Brian Beals comes before this Court seeking justice and accountability.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City admits that Plaintiff and his attorneys are seeking monetary compensation based on their allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 10.**

### JURISDICTION AND VENUE

11.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this is an action arising under 42 U.S.C. § 1983.

**ANSWER:** **The City admits that Plaintiff purports to bring some counts of this action**

---

[1] Charlotte West, *An incarcerated instructor taught that Jim Crow literacy tests were racist. Then he was fired.*, Open Campus (Mar. 21, 2024), https://www.opencampusmedia.org/2024/03/21/an-incarcerated-instructor-taught- that-jim-crow-literacy-tests-were-racist-then-he-was-fired/.

[2] Atavia Reed, *35 Years After Wrongful Conviction, Englewood's Brian Beals Is Getting His Life Back*, Block Club Chi. (Feb. 13, 2024), https://blockclubchicago.org/2024/02/13/35-years-after-his-wrongful-conviction-englewoods-brian-beals-is-getting-his-life-back/.

[3] Brian Beals, *Broken Pieces*, PEN America (Mar. 22, 2021), https://pen.org/broken-pieces/.

[4] *2023 PEN America Prison Writing Contest Winners Announced*, PEN America (Sept. 12, 2023), https://pen.org/press-release/2023-pen-america-prison-writing-contest-winners-announced/.

[5] *Id.*

**under 42 U.S.C. § 1983 and the Court has jurisdiction under 28 U.S.C.
§§1331. The City denies the remaining allegations contained in Paragraph
11.**

12.    The Court has jurisdiction over the state law claims pursuant to 28 U.S.C. §

1367(a) because those claims are so related to the claims providing the basis for federal subject

matter jurisdiction that they form part of the same case or controversy under Article III of the

United States Constitution.

**ANSWER:    The City admits that this Court has jurisdiction over Plaintiff's claims. The
City denies the remaining allegations in this paragraph to the extent they
direct allegations of misconduct against it.**

13.    The Court has personal jurisdiction over Defendants because at least some reside

in the State of Illinois and because their conduct described herein occurred exclusively in

Illinois.

**ANSWER:    Upon information and belief, the City admits that some of the Defendants
reside in Illinois and that the alleged events giving rise to the claims in this
Complaint occurred in Illinois. The City denies the remaining allegations in
this paragraph to the extent they direct allegations of misconduct against it.**

14.    Venue is proper in this jurisdiction under 28 U.S.C. § 1391 because Plaintiff's

injury and damages occurred in the Northern District of Illinois, there are Defendants who reside

and conduct business in the Northern District of Illinois, and all events giving rise to this action

occurred in the Northern District of Illinois.

**ANSWER:    The City admits that venue is proper in this Court, and the events alleged
giving rise to this action occurred within this judicial district. The City lacks
knowledge or information sufficient to form a belief as to the truth of the
remaining allegations contained in Paragraph 14.**

## PARTIES

15.     Brian Beals was wrongfully convicted of the murder of Demetrius Campbell and the aggravated battery of Valerie Campbell. He served 35 years in prison. He now resides in Chicago, Illinois.

**ANSWER:     The City denies that Brian Beals was wrongfully convicted. The City admits Brian Beals was convicted of the murder of Demetrius Campbell and the aggravated battery of Valerie Campbell and was incarcerated approximately 35 years. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 15.**

16.     Defendant Michael Ptak, as Special Representative for Thomas Ptak, Deceased, is the legally appointed representative for Thomas Ptak.  Detective Thomas Ptak was a detective with the Chicago Police Department and, serving in that capacity, was involved with, participated in, and conspired among the other Defendant CPD Officers and Detectives to secure the wrongful arrest, prosecution, and conviction of Brian Beals.

**ANSWER:     On information and belief, the City admits that Defendant Michael Ptak was appointed the Special Representative for Thomas Ptak, Deceased. The City admits that Thomas Ptak was a detective with the Chicago Police Department during the investigation of the murder of Demetrius Campbell. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 16.**

17.     Defendant Michael Duffin was a detective with the Chicago Police Department and, serving in that capacity, was involved with, participated in, and conspired among the other Defendant CPD Officers and Detectives to secure the wrongful arrest, prosecution, and conviction of Brian Beals.

**ANSWER:     The City admits that Defendant Michael Duffin was a detective with the Chicago Police Department during the investigation of the murder of Demetrius Campbell. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 17.**

18.    Defendant Patrick R. Doyle, Jr. was an officer with the Chicago Police Department and, serving in that capacity, was involved with, participated in, and conspired among the other Defendant CPD Officers and Detectives to secure the wrongful arrest, prosecution, and conviction of Brian Beals.

**ANSWER:**    **The City admits that Defendant Patrick R. Doyle, Jr. was an officer with the Chicago Police Department during the investigation of the murder of Demetrius Campbell. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 18.**

19.    Defendant Michael J. Wilson was an officer with the Chicago Police Department and, serving in that capacity, was involved with, participated in, and conspired among the other Defendant CPD Officers and Detectives to secure the wrongful arrest, prosecution, and conviction of Brian Beals.

**ANSWER:**    **The City admits that Defendant Michael J. Wilson was an officer with the Chicago Police Department during the investigation of the murder of Demetrius Campbell. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 19.**

20.    The City of Chicago is a municipal corporation which, at all relevant times, employed the Defendant CPD Officers and Detectives. As discussed below, the City of Chicago, through its police department, had a de facto policy and/or pattern and practice of condoning, enabling, and rewarding its detectives and officers to manipulate witnesses, fabricate evidence, commit *Brady* violations, and engage in other unconstitutional conduct.

**ANSWER:**    **The City admits that the City of Chicago is a municipal corporation which employed the Defendant Chicago Police Department Officers and Detectives during the investigation of the murder of Demetrius Campbell. The City denies the remaining allegations contained in Paragraph 20.**

## FACTUAL BACKGROUND

21.    Brian was a college student at Southern Illinois University, where he played for

the football team and studied to be a law enforcement officer. A native son of Englewood, Brian

and his family were longtime residents of Chicago. By 1988, however, they started to see the

growth of a vicious cocaine ring in the neighborhood they had always called home.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21.**

22.      Brian was in Englewood around the Thanksgiving holiday in 1988. His family

lived at 5941 S. Eggleston, a loving and crowded home where Brian's mother, sister, nieces, and

nephews all lived. Brian decided to rent a studio apartment around the corner at 451 W. 60th

Street. Brian leased the studio apartment from Lucilla "CC" Tyler.

**ANSWER:** **Based upon records from the Chicago Police Department, the City admits that Plaintiff had family that lived at 5941 S. Eggleston. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 22.**

23.      On November 16, 1988, Brian, with the help of his friend, Sidney Cobb, was

moving into the studio apartment. While he was doing so, a well-known neighborhood drug

dealer, Stevie Johnson, approached CC Tyler and told her that Brian had a lot of "enemies" and

that "a lot more stuff was going to start back up" if she allowed Brian to live there. Brian

overheard Stevie Johnson tell Ms. Tyler that she should get out of the house because they were

about to come back and shoot it up.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 23.**

24.      Brian then confronted Stevie Johnson and got into a verbal altercation with him

outside the home on 60th Street. The photo below is CC Tyler's house on 60th Street. It was

taken within a couple of months after the shooting by Brian's sister, Pattilyn Beals, who spoke

with a number of community members and took a series of photographs after the police, who

immediately targeted Brian, neglected to canvass the area or investigate the shootings.



**ANSWER:** **Based upon records from the Chicago Police Department, the City admits that Plaintiff was involved in a verbal disagreement with Steve Johnson outside a home on 60th Street. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 24.**

25. While Brian and Stevie Johnson were arguing on the street, Valerie Campbell, her boyfriend, Derrik [sic] Lewis, and Ms. Campbell's three children, Cordell (10), Antonio (7), and Demetrius (6), happened to be walking westbound on 60th Street. Derrik [sic] Lewis was from the area and knew both Stevie Johnson and Brian Beals. He intervened in the argument between Stevie and Brian while Ms. Campbell and her children continued walking west down 60th Street.

**ANSWER:** **Based upon records from the Chicago Police Department, the City admits the allegations contained in Paragraph 25.**

26. Stevie Johnson warned Brian that he better not be there when Stevie got back. Then, Stevie Johnson and Derrik [sic] Lewis got into Stevie's car, a flashy blue IROC-Z Camaro, and drove about a half-block eastbound (the opposite direction Ms. Campbell and her children were walking) to Eggleston Avenue, where they turned left and parked.

**ANSWER:** **Based upon records from the Chicago Police Department, the City admits that Steve Johnson and Derik Lewis got into a blue Camaro. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 26.**

27. Brian felt threatened by the argument -— especially by what he heard Stevie Johnson say to CC Tyler -— and ran upstairs to his studio apartment to get his car keys and leave. While he was upstairs, Brian saw Stevie Johnson parked on the street corner of 60th Street and Eggleston talking to a man who was leaning into the window of the car. Brian quickly told Sidney Cobb what happened, grabbed his coat and car keys, and left the scene. Brian did not have a gun on him.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27.**

**THE SHOOTING**

28. As Brian ran outside to get into his car (which he had borrowed from a friend, Ronnie Allen), he saw the same man previously standing at Stevie Johnson's car window running toward him with a gun. Brian quickly got into his car and sped westbound down 60th – Street, away from Stevie Johnson's car and the man with the gun.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28.**

29. As Brian looked in his rearview mirror, Brian saw the same man firing shots at him from the alley. The shots came from the east and were fired towards Brian's car as he sped away, which happened to be the same direction the Campbell family was walking. As the shots rang out, Valerie Campbell picked up her six-year-old, Demetrius, and ran westbound

**ANSWER:** **Based upon records from the Chicago Police Department, the City admits Brian drove in the same direction the Campbell family was walking and that Valerie Campbell picked up her six-year-old, Demetrius, and ran westbound when shots rang out. The City lacks knowledge or information sufficient to**

form a belief as to the truth of the remaining allegations contained in Paragraph 29.

30.     A demonstrative depiction of the scene and the parties' respective whereabout is below.



**ANSWER:    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30.**

31.     Unbeknownst to Brian, instead of hitting him, the gunshots hit six-year-old Demetrius Campbell and his mother, Valerie Campbell. Tragically, one bullet struck Demetrius in the front of his throat as his mother was holding him and running away from the gunfire. Another bullet hit Ms. Campbell in her thigh.

**ANSWER:    Based upon records from the Chicago Police Department, the City admits that at some point Demetrius Campbell was shot in the neck and his mother, Valerie Campbell, was shot in the thigh. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 31.**

32.     Brian was the intended target of the gunfire that hit the Campbells, but in a mystifying twist of fate, within minutes, Brian went from being a would-be homicide victim to the lone suspect accused of shooting the Campbells.

**ANSWER:     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32.**

33.     Ms. Campbell and her children continued to run westbound down 60th Street, under the viaduct, and ultimately to a house at 625 W. 60th Street, where a Good Samaritan, Pandora Scott, let them in. Ms. Scott called 9-1-1, and, ultimately, separate ambulances took Demetrius Campbell and Valerie Campbell from Ms. Scott's house to the hospital.

**ANSWER:     Based upon records from the Chicago Police Department, the City admits that after she and Demetrius Campbell were shot, Valerie Campbell arrived at 625 W. 60th Street with her children. Answering further, the City admits that at Plaintiff's criminal trial Pandora Gipson testified that she lived at that address and let them in, that she asked her mother to call the police and the ambulance, that a detective arrived "who tried to do what he could do," and that separate Chicago Fire Department ambulances transported Valerie and Demetrius to the hospital. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 33.**

34.     The first officer on scene was Patrick Doyle, who interviewed Ms. Campbell and reported her account of what happened. Ms. Campbell reported that while walking down the street she had "observed unknown males on the street a few feet away who were involved in a heavy argument." Ms. Campbell's statement makes no mention of seeing the shooter, much less identifying the shooter.

**ANSWER:     Based upon records from the Chicago Police Department, the City admits that Patrick Doyle responded to a call of a boy shot at 625 W. 60th Street, where he met with and interviewed Valerie Campbell with regard to the shooting and prepared a report summarizing that interview. Answering further, the City admits that, according to Defendant Doyle's report, Campbell "heard a gunshot…and observed [the] offender holding a blue steel handgun, pointed at her." The City denies that Defendant Doyle's report includes the quotation attributed to Campbell in Paragraph 34 and**

**further denies that his report indicates that Campbell "[made] no mention of seeing the shooter." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 34.**

## THE ARREST

35.     Meanwhile, Brian Beals — who was fleeing westbound on 60th Street trying to get away from the gunfire — had no idea anyone had been shot. Brian turned at the corner of Frontenac Avenue, just a couple of blocks west, and went to his friend Mark Terrell's house to seek refuge from his would-be assassins.

**ANSWER:     Based upon records from the Chicago Police Department, the City admits that Brian Beals went to his friend Mark Terrell's house. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 35.**

36.     Mr. Terrell lived a half block from, and in clear view of, the police station at 61st and Racine. Brian parked on the street in plain sight of the police station (certainly an odd choice if he was indeed the shooter).

**ANSWER:     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36.**

37.     Brian immediately told Mark Terrell that he was being shot at and was concerned for the safety of his family, who lived directly across the street from Stevie Johnson on Eggleston. He asked Mark Terrell to drive him to his family's home (another odd choice if he was indeed the shooter because everyone would know to find him there). But rather than driving Brian's car — which Brian feared would result in being targeted again by his would-be assassins — they took Mark Terrell's car.

**ANSWER:     Based upon records from the Chicago Police Department, the City admits that Mark Terrell drove Brian to his family's house. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 37.**

38.     Brian and Mark Terrell arrived at the Beals' home. Once inside, amidst the chaos, there was a loud banging on the door. Believing his would-be assassins may be coming for him yet again, Brian fled to the basement to hide. It was the police, however, and they immediately went inside and arrested both Brian and Mark Terrell.

**ANSWER:     Based upon records from the Chicago Police Department, the City admits that Chicago Police officers arrested Plaintiff for murder after they found him hiding under a pile of clothes in the basement at 5941 S. Eggleston, and they arrested Mark Terrell at the same location for aiding a fugitive. The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38.**

39.     Brian was arrested within approximately 30 minutes of the shooting. His arrest, prosecution, and ultimate conviction were the product of unconstitutional police misconduct by CPD and the Defendant CPD Officers and Detectives.

**ANSWER:     Based upon records from the Chicago Police Department, the City admits that Plaintiff was arrested within approximately thirty minutes of the shooting. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 39.**

## BRIAN BEALS' INNOCENCE

40.     There has never been any legitimate evidence connecting Brian Beals to these shootings.

**ANSWER:     Based upon records from the Chicago Police Department, the City denies the allegations contained in Paragraph 40.**

41.     First, Brian Beals had **zero motive** to shoot the Campbell Family.

**ANSWER:     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 41.**

42.     During the underlying criminal prosecution, there was no dispute that Brian and Stevie Johnson had gotten into a verbal altercation, that Derrik [sic] Lewis intervened and got

into Stevie Johnson's car, and that Brian fled in his car westbound on 60th Street in the same

direction the Campbells were walking.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 42.**

43.     Brian had no motive to shoot at the Campbell Family, so the Defendant CPD

Officers and Detectives initially concocted an alternative narrative – one where Brian Beals was

shooting at Steve Johnson's car as they both drove westbound down 60th Street.  The entire

narrative was false: Stevie Johnson did not drive westbound on 60th; Brian Beals was not chasing

Stevie Johnson's car, and Brian Beals did not shoot at Stevie Johnson, or anyone else.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43.**

44.     To support this false narrative, CPD Detectives Ptak and Duffin, and other

unknown officers threatened, intimidated, and manipulated Stevie Johnson during an interview

on the night of the shooting. According to Stevie Johnson, the police officers threatened him

during the interview, put on leather gloves to scare him, and told him what to say about Brian, all

the while implying that he would be beaten if he did not comply. Stevie Johnson was told to lie

about his whereabouts during the shooting to say he was driving in front of Brian Beals, as if

Brian was shooting at him and missed, instead hitting the Campbells.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 44.**

45.     In furtherance of this concocted narrative, that same evening Detective Duffin

falsely reported to the Chicago Tribune that, after the argument, both Stevie Johnson and Brian

Beals drove west on 60th Street, with Brian firing at Johnson's car. The relevant portion of the

Tribune's article is copied below:

# CHILD SLAIN, MOTHER WOUNDED BY ERRANT SHOTS FROM DRUG FEUD

By Jessica Seigel and Robert Blau
Chicago Tribune

*

Published: Nov 17, 1988 at 12:00 am

Detective Michael Duffin, also of Brighton Park, said that on 60th Street near Normal Boulevard the family met two acquaintances of Lewis` who were quarreling over drugs. One acquaintance allegedly was Beals. Police would not identify the other person, saying he was a witness to the shooting.

Lewis stopped and tried to calm the quarrel, Duffin said. Campbell and her children continued walking west on 60th Street.

Soon, Lewis got in a car with the unidentified man, and Beals got in a separate car. Both cars headed west on 60th Street, Duffin said.

Within moments, Beals began firing at the man with Lewis in the other car but missed him, Duffin said.

Instead, one or two bullets hit Demetrius and Valerie Campbell walking on the street, the detective said.

**ANSWER:** **The City, upon information and belief, admits only that the Chicago Tribune published an article containing the portions of the article reproduced in paragraph 45. Further answering, the City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 45.**

46. This was a total fabrication, as no one has ever said or suggested that Stevie Johnson drove west on 60th in front of Brian Beals, nor is that narrative documented in any police reports. But because Brian had zero motive to shoot at the Campbells, the police created this concocted a  this false story.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 46.**

47. Not only did Brian have no motive to shoot the Campbells, but there was **zero forensic evidence** connecting Brian to the shootings. In fact, the forensic evidence exonerates him.

17

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 47.**

48.　First, no firearm associated with the shooting was ever located. The shooting is reported as having occurred at 3:30 p.m. There is no dispute that Brian drove to Mark Terrell's, parked in plain view of the police station, and then drove with Mr. Terrell to the Beals' family home, where he was arrested at 4:00 p.m. Both Brian and Mark Terrell were arrested, and the police searched their cars and the surrounding area for the murder weapon. No weapon or shell casings were ever recovered, and there is no legitimate theory as to how they were disposed of within 30 minutes in the close confines of a couple-block radius.

**ANSWER:** **Based upon records from the Chicago Police Department, the City admits that the shooting was reported to have occurred at 3:30 p.m. on November 16, 1988, and that Plaintiff and Mark Terrell were arrested at approximately 4:00 p.m. that same day. Answering further, based upon records from the Chicago Police Department, the City admits that in the evening of November 16 Chicago Police Department evidence technicians took photographs of the scene of the shooting and searched for pertinent physical evidence with negative results. The City further admits that Defendants Ptak and Duffin searched the cars of Plaintiff and Terrell and recovered from Terrell's vehicle an orange and white Adidas jacket identified by Antonio and Cordell Campbell as the jacket worn by Plaintiff at the time of the shooting. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 48.**

49.　Second, Brian had no gunshot residue on his person. Gunshot Residue ("GSR") tests, processed by the FBI, resulted in "insignificant" findings, meaning there was no forensic evidence indicating that Brian had fired a weapon. In fact, the testing proves that Brian had **not** fired a weapon. During the underlying prosecution, Detective Ptak testified that the GSR test on Brian Beals was not done until three hours after the shooting event, at which time "it's very inconclusive" — indicating to the jury that the gunshot residue test was taken too late to mean anything. However, an internal CPD memo written by Detective Ptak and approved by Commander Jon Burge states that "[i]n that the time of the arrest was within the two-hour time

limit of the homicide[,] Gunshot Reside Tests were taken from the arrestee who was subsequently charged with First Degree Murder." This was not just an instance of Detective Ptak lying to the jury, but CPD committed a *Brady* violation by failing to turn over this exculpatory memo. And perhaps most importantly, the GSR testing showing "insignificant findings" is highly probative of his innocence.

**ANSWER:** **Based on a report of the Federal Bureau of Investigation, the City admits that the amounts of gunshot residue detected on Plaintiff were "insignificant" and therefore "it could not be determined if [Plaintiff] discharged a firearm or was in an environment where gunshot primer residue was present." Answering further, the City admits that Defendant Ptak testified at Plaintiff's criminal trial that the outer time limit after which a GSR test is not effective is "roughly two to three hours. Past three hours [a gunshot residue test] is very inconclusive," and that the GSR conducted on Plaintiff "was done at approximately 6:30, which would be the three-hour limit." Based on records of the Chicago Police Department, the City, upon information and belief, admits that in a May 9 1989 memo to the Chief of Detectives, approved, in part, by Jon Burge, *inter alia*, Defendant Ptak stated that "[i]n that the time of the arrest was within the two hour limit of the homicide Gunshot Residue Tests were taken from the arrestee." To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 49.**

50. Third, there were fresh bullet holes in the back passenger side of the car Brian was driving. The location of the bullet holes is consistent with a shooter in the alley on the north side of 60th shooting at Brian as he was driving westbound, with errant bullets striking the Campbells, who were walking on the south side of 60th. The bullet holes in the car are identifiable using technology to zoom in on the photograph of the car (see below). Additionally, the owner of the car, Ronnie Allen, confirmed when he saw the car after the shooting "there were bullet holes in the back passenger side and bullet grooves along the passenger side," while there were no bullet holes whatsoever when he let Brian borrow the car. Detective Ptak inspected the car and did not document the existence of the bullet holes because they contradicted the narrative

CPD constructed and, more than that, proved Brian's innocence. This was yet another *Brady*

violation. In addition, Detective Ptak lied to the jury when he testified that he inspected Brian's

car but did not observe any bullet holes.



**ANSWER:** **Upon information and belief, the City admits that in a sworn affidavit Ronnie Allen affirmed that in November of 1988 he let Plaintiff use his car to drive to Chicago, there were no holes in his car at the time he did so, and the next time he saw his car there were bullet holes in the back on the passenger side and bullet grooves along the passenger side. Answering further, upon information and belief, Defendant Ptak testified at Plaintiff's criminal trial that following Plaintiff's arrest, he looked at the car Plaintiff was driving and there were no bullet holes. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 50.**

51.     Eyewitness observations further confirm Brian's innocence. Several independent eyewitnesses confirm that a man was in the alley shooting at Brian as he fled in his car westbound on 60th.

> o Norman Yancy and Karen Shaw were at their home immediately next door to CC Tyler's house and directly across from the alley. Mr. Yancy saw the shooting from his window and confirmed a male was shooting west. Ms. Shaw did not see the actual shooting, but immediately afterwards saw a male picked up in the alley by a dark blue sports car, consistent with Stevie Johnson's IROC-Z Camaro.
>
> o Sidney Cobb was still in CC Tyler's house when Brian grabbed his coat and keys and left. He followed Brian outside, and, as Brian was driving away, he saw someone in a jogging suit shooting westbound at Brian's car.
>
> o Jerome Covington lived on the corner of 60th and Eggleston and had a porch overlooking 60th. He was sitting on his porch when Brian and Stevie Johnson were arguing, and later saw a man in a jogging suit come out of the alley and start shooting at Brian as he was driving away.
>
> o John Battle was a housepainter who, at the time of the shooting, had been painting the house on 60th and Normal, directly across the street from CC Tyler's house. Mr. Battle also saw the argument on the street, and subsequently saw a man in a jogging suit come from the alley and shoot towards Brian as he was driving away.
>
> o Lenard McKinney was 14 years old at the time of the shooting. He too saw a man in a jogging suit shooting at Brian as he drove away in his car.

o Finally, Derrik [sic] Lewis — who was with Stevie Johnson and the man

standing in the window of Johnson's car moments before the shooting — has

confirmed in an affidavit that "Brian was actually the one being shot at."

**ANSWER:** **Upon information and belief, the City admits that in a sworn affidavit Derik Lewis attested that "Brian was actually the one being shot at." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 51.**

52.     Brian had no motive to shoot the Campbells, the eyewitness accounts are

consistent that Brian was the one being shot at as he was driving westbound on 60th, and the

forensic evidence showing the absence of gunshot residue on Brian and the presence of bullet

holes on his car is exculpatory, if not exonerating. Therefore, for CPD to secure a conviction

against Brian, it had to resort to foul play, *i.e.*, unconstitutional misconduct.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 52.**

## CPD's MANIPULATION OF VALERIE CAMPBELL, ANTONIO CAMPBELL, DERRIK [sic] LEWIS, AND STEVIE JOHNSON

53.     Given the lack of motive and the absence of physical or forensic evidence

connecting Brian to the crimes, the State's case against Brian relied almost entirely upon

purported "eyewitness identifications" of Brian Beals by Valerie Campbell and her then-eight-

year-old-son, Antonio Campbell, along with corroborating testimony from Derrik [sic] Lewis

and Stevie Johnson. All of this testimony was the product of police manipulation and/or

coercion.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 53.**

**Valerie Campbell's First Account – No Identification**

54.     As noted above, the initial accounting from Valerie Campbell as reported by

Officer Doyle does not identify Brian Beals as the shooter. Instead, the report says that Ms.

Campbell observed "unknown males on the street a few feet away who were involved in a heavy

argument." It does not mention Brian Beals, the "fat man," a maroon car, or any identifying

information whatsoever.

**ANSWER:     Based on records of the Chicago Police Department, the City admits that
while responding to a call of a boy shot at 625 W. 60th Street, Patrick Doyle
met with and interviewed Valerie Campbell with regard to the shooting and
prepared a report summarizing that interview. Answering further, the City
admits that Defendant Doyle's report did not note that Campbell identified
Plaintiff as the shooter, mention Plaintiff, the "fat man," a maroon car, or
any identifying information. The City further admits that, according to
Defendant Doyle's report, Campbell "heard a gunshot…and observed [the]
offender holding a blue steel handgun, pointed at her." The City denies that
Defendant Doyle's report includes the quotation attributed to Campbell in
Paragraph 54 and further denies that his report indicates that Campbell
"[made] no mention of seeing the shooter." The City lacks knowledge or
information sufficient to form a belief as to the truth of the remaining
allegations contained in Paragraph 54.**

**Valerie Campbell's Second Account – Describing a "fat man," who was identified
by Derrik [sic] Lewis as Brian Beals**

55.     Ms. Campbell's story then evolved from not identifying anyone to identifying

Brian Beals. According to trial testimony from CPD Officer Michael J. Wilson, while at Pandora

Scott's house Ms. Campbell told him that a fat man driving a red car and wearing a red and white

jacket shot them. Officer Wilson further testified that the two surviving children reported that a

fat man in a red car shot their brother.

**ANSWER:     Upon information and belief, the City admits that at Plaintiff's criminal trial
Defendant Wilson testified that while at 625 West 60th Street Valerie
Campbell described the person who shot her and Demetrius Campbell as
"between five-nine and six foot tall, very heavy, about 250 pounds," "wearing
a red and white jacket" and "driving a red car." Answering further, upon**

information and belief, the City admits that Defendant Wilson testified that
while at 625 West 60th Street Demetrius Campbell's brothers told him that
"the fat man in the red car" shot Demetrius. The City lacks knowledge or
information sufficient to form a belief as to the truth of the remaining
allegations contained in Paragraph 55.

56.     Subsequently, according to Officer Wilson, Derrik [sic] Lewis verbally identified

the "fat man" as Brian Beals. From there, Officer Wilson reported that they took Derrik [sic]

Lewis to the Beals' home, at which point he physically identified Brian Beals.

**ANSWER:    Upon information and belief, the City admits that at Plaintiff's criminal trial
Defendant Wilson testified that while at 625 West 60th Street he was
informed that the name of the fat man in the red car was Brian Beals.
Answering further, upon information and belief, the City admits that
Defendant Wilson testified that he and his partner took Derik Lewis to 5941
South Eggleston and at that location Lewis identified Beals. The City lacks
knowledge or information sufficient to form a belief as to the truth of the
remaining allegations contained in Paragraph 56.**

57.     None of this was documented anywhere by Officer Wilson.

**ANSWER:    Based on records of the Chicago Police Department, the City denies the
allegations contained in Paragraph 57.**

58.     As described throughout this section, the Defendant CPD Officers and Detectives

manipulated Valerie Campbell into identifying a "fat man" or Brian Beals. When Ms. Campbell

offered her purported description of the "fat man" in the red car, her young child had just been

shot and killed, she had been shot herself, and she was in an incredibly vulnerable and

susceptible posture.

**ANSWER:    The City lacks knowledge or information sufficient to form a belief as to the
truth of the allegations contained in Paragraph 58.**

59.     CPD also manipulated Derrik [sic] Lewis into falsely testifying that he and

Valerie Campbell identified Brian Beals, or the "fat man," as the shooter. In particular, CPD

treated Derrik [sic] Lewis as a suspect by fingerprinting him and testing him for gunshot residue

and then interrogated him about gangs and drugs, all with the intent of threatening him and

forcing his cooperation.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. Upon information and belief, the City admits that Derik Lewis was interviewed and tested for gunshot residue. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 59.**

60.     Derrik [sic] Lewis has since recanted his trial testimony and attested that CPD scared him during his interrogation and that he was told to testify how they wanted him to. Derrik [sic] Lewis has attested via sworn affidavit that Ms. Campbell "didn't see anyone with a gun or shoot" and that he knows "Brian Beals is innocent." Contrary to the testimony provided by CPD Officer Wilson, Derrik [sic] Lewis was also not taken to the Beals' residence to identify Brian Beals.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. Upon information and belief, the City admits that in a sworn affidavit Derik Lewis attested that he "was very scared" when he was at the police station and that the prosecutor told him to "just testify as they wanted me to." Answering further, upon information and belief, the City admits that in a sworn affidavit Lewis attested that "I know that [Valerie Campbell] didn't see anyone with a gun or shoot" and "I know Brian Beals is innocent." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 60.**

61.     The Defendant CPD Officers and Detectives similarly manipulated Stevie Johnson into supporting Valerie Campbell's purported identification of Brian Beals. At trial, Stevie Johnson testified that "I asked Valerie was she sure it was Brian because he don't seem like that type of person. She said she seen him stick his hand out the window." This testimony was the product of manipulation.

**ANSWER:** **Upon information and belief, the City admits that at Plaintiff's criminal trial Stevie Johnson testified that "I asked Valerie was she sure it was Brian because he don't seem like that type of person. She said she seen him stick his hand out the window." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in**

**Paragraph 61.**

62.     Stevie Johnson has since recanted his testimony and explained that CPD officers and detectives threatened him, put leather gloves on to threaten him with the prospect of physical violence, told him what to say about Brian, and implied that he would be beaten if he did not cooperate. Ultimately, Stevie Johnson gave a statement to the CPD officers and detectives, but that statement was never produced.

**ANSWER:     Upon information and belief, the City admits that in a sworn affidavit Stevie Johnson attested that "I remember officers putting on gloves threatening to beat me" and that they "told me this is what you're going to say about Brian implying I'd get beaten up if I didn't say it." Answering further, based on records of the Chicago Police Department, the City admits that Stevie Johnson was interviewed by CPD detectives investigating the shootings. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 62.**

63.     Stevie Johnson has now affirmed via sworn affidavit that "Brian Beals is innocent of this crime and did not shoot Valerie or Demetrius." He has further affirmed that he never saw Brian Beals with a gun that day, let alone ever.

**ANSWER:     Upon information and belief, the City admits that in a sworn affidavit Stevie Johnson attested that "I believe Brian Beals is innocent of this crime and did not shoot Valerie or Demetrious" and that "I never saw Brian Beals with a gun that day and I never saw him shoot a gun. I have never once seen Brian with a gun ever." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 63.**

64.     Manipulating and intimidating witnesses, as was done in this case, was part of CPD's *modus operandi*. In addition to using threatening tactics with Derrik [sic] Lewis and Stevie Johnson, CPD officers and detectives also tried to coerce Mark Terrell into testifying against Brian Beals. As noted above, Brian went directly to Mark Terrell's after his argument with Stevie Johnson (where he parked in front of the police station), and then Mark Terrell drove Brian to his family home. Both Brian and Mark Terrell were arrested.

**ANSWER:**   **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. Answering further, based upon records from the Chicago Police Department, the City admits that on November 16, 1988, Plaintiff and Mark Terrell were arrested. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 64.**

65.   CPD kept Mark Terrell in custody for two days without allowing him to contact his family. While he was interrogated, CPD officers and/or detectives grabbed him by the collar and slammed him against the wall, beat him with a telephone book and a baton, and threatened that they would charge him with the shooting if he did not cooperate by implicating Brian Beals.

**ANSWER:**   **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 65.**

**Valerie Campbell's Third Account – Observing Brian Beals with a Gun After the Shooting**

66.   The police reports prepared after Brian was arrested further expanded the narrative from that described above. In a report submitted late in the evening after the shooting, it was reported that Ms. Campbell heard a gunshot and noticed that her son had been shot in the neck, *after which* she "turned around at this time and observed [Brian Beals] holding a blue steel handgun, pointed in her direction."

**ANSWER:**   **Based upon records from the Chicago Police Department, the City admits that a police report prepared on November 16, 1988, after the shooting, indicates, in part, that "Victim #2 [Valerie Campbell] states she heard a gunshot at which time she noticed Victim #1 [Demetrius Campbell] had been shot in the front of the neck. Victim #2 turned around at this time and observed offender holding a blue steel handgun, pointed in her direction." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 66.**

67.   This false narrative, which was written up by Officer Doyle, was either entirely contrived by the Defendant CPD Detectives and Officers or it was fed to Valerie Campbell by

27

them.

**ANSWER:** **Upon information and belief, the City admits that Defendant Doyle prepared the narrative section of the General Offense Case Report prepared on November 16, 1988, after the shooting. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 67.**

## Valerie Campbell's Fourth Account – Observing Brian Beals in his Car with a Gun Shooting at Them

68.     The next evening, in another police report, a different and more detailed narrative emerged:

> [Ms. Campbell] and the children [sic] were about half way down the block west of Normal when she heard Brian Beals speeding in their direction in a 1977 Maroon Chevy. **As he got close to them she saw Beals stick his hand out of the drivers side window. He had a blue steel hand gun in his hand pointed at her and the children.** She told the children to run one of her children hid behind a bush she tried to shield the other two children from the gun-men**. She saw Beals shoot the gun in their direction between two and four times.** She felt herself get hit in the leg with a bullet and looked down to see her six year old son Demetrius bleeding from a bullet hole in neck. (emphasis added).

**ANSWER:** **Based upon records from the Chicago Police Department, the City admits that the portion of the police report quoted in Paragraph 68 is accurate. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 68.**

69.     In these four reports alone, the story went from saying nothing whatsoever about the shooter, to seeing "the fat man" with a gun, to seeing Brian Beals holding a handgun **after** Demetrius was shot, to hearing Brian Beals speeding in their direction and seeing him stick a gun out the window **before** any shots were fired. And then came the testimony at trial.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 69.**

## Valerie Campbell's Fifth Account – The Undocumented, Nonsensical Surprise Testimony at Trial

70.     In what the prosecution called the "most significant" part of Ms. Campbell's

testimony, she gave a story at trial that was not previously documented in any police reports. Ms. Campbell testified that after the shooting, she ran with her family and hid them on a porch of a house. She then testified that: "As I was standing on the side of the house, the fat guy, he got out the car and he stood there at least two or three minutes and looked around. And he got back into his car and drove around the corner."

**ANSWER:** **Upon information and belief, the City admits that Valerie Campbell testified at Plaintiff's criminal trial that after the shooting she ran toward a house on 60th Street, hid her older two sons on the porch, and stood on the outside of the house, holding Demetrius. Answering further, upon information and belief, the City admits that Campbell testified that "[a]s I was standing on the side of the house, the fat guy, he got out the car and he stood there at least two or three minutes and looked around. And he got back into his car and he drove around the corner." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 70.**

71.     In other words, Ms. Campbell testified at trial that after Brian (inexplicably) shot at the Campbell family, he got out of the car, and for two to three minutes, stood in plain sight, seemingly stalking a family he had no motive to harm. There is no report documenting this story; it literally came up for the first time at trial.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 71.**

72.     What makes Ms. Campbell's story at trial particularly incredulous is that it was broad daylight and the spot where they were purportedly hiding was confined to a very small area a matter of feet off the roadway. If Ms. Campbell's testimony at trial was true, that would mean that after he shot the Campbells (for no reason), Brian Beals would have lost sight of them as they ran over to a house on the side of the road, walked over in their direction, stood within a matter of feet of them in broad daylight for 2-3 minutes, not have heard a whimper or a peep from a gunshot victim or a traumatized family, he looked around the area, and yet, for some

reason, he could not see them. Everything about the story was fabricated.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 72.**

73.     The reason Valerie Campbell's story evolved the way it did was because the Defendant CPD Officers and Detectives, including specifically Detectives Ptak and Duffin, manipulated her into testifying in this manner. Valerie Campbell was vulnerable at baseline and became far more vulnerable after her child was tragically killed. The Defendant CPD Officers and Detectives knew that Ms. Campbell could not have seen gunfire coming from behind her. However, they manipulated her into identifying the easy target, Brian Beals, and then expanding her story up through trial to say that Brian got out of his car and stood within a matter of feet of her after the shooting. This last narrative was fed to Ms. Campbell by the Defendant CPD Officers and Detectives, and particularly Detective Ptak, because they knew that without some testimony establishing a clear visual of Brian Beals, no reasonable jury would believe her identification.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73.**

74.     When Detective Ptak was asked why he did not report the story Valerie Campbell offered for the first time at trial, he testified "I've committed an error." It was not an error, though, because Ms. Campbell never told CPD that in the first instance. If she had, it would have undoubtedly been documented because, as the prosecution remarked, it was the "most significant" evidence they had.

**ANSWER:** **Upon information and belief, the City denies that Defendant Ptak's testimony, "I've committed an error," was an answer to the question why he did not report the story Valerie Campbell offered for the first time at trial. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 74.**

30

75.    Valerie Campbell's son, Antonio Campbell, was also manipulated by the Defendant CPD Officers and Detectives too. According to a CPD report, Antonio (then 7) and his brother Cordell (then 10) were taken by Detectives Ptak and Duffin to the Beals' residence after the shooting, and when they saw Brian walking in the house, they simultaneously "outcried 'that's him.'"

**ANSWER:    Based on Chicago Police Department records, the City admits that after the shooting Defendants Ptak and Duffin took Antonio and Cordell Campbell in the rear of their squad car to 5941 S. Eggleston, and as a male black with a large build entered the house the children in the back seat of the car outcried, "that's him." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 75.**

76.    The older child, Cordell, was not called to testify at trial. Antonio, who was only eight at the time of trial, was called to testify and for the most part echoed his mother's story. He testified that he saw "the fat man" driving with one hand on the steering wheel and with his left hand out the window shooting a gun. He further testified "the fat man" stopped in his car and looked around, but unlike Ms. Campbell, Antonio testified he did not get out of the car (further proving the incredulous nature of Ms. Campbell's trial testimony).

**ANSWER:    Upon information and belief, the City admits that Cordell Campbell did not testify at trial. Answering further, based upon information and belief, the City admits that Antonio Campbell, who was eight-years-old at the time, testified that he saw the "fat man" driving with one hand on the driving wheel and one hand out the window with his gun in it, and that the "fat man" stopped and looked around while still in his car, and then drove away. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 76.**

77.    Derrik [sic] Lewis refutes this CPD-created narrative. He affirmed that while he was still at the Good Samaratin's house right after the shooting, he asked Antonio and Cordell what happened, and they said they said they did not see anything specific.

**ANSWER:** **Upon information and belief, the City admits that in his sworn affidavit Derik Lewis attested that "I also asked Cordell and Antonio what happened and they didn't see anything specific—just knew that their mom and brother had been shot." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 77.**

78. CPD's role in creating the false narrative that Valerie and Antonio Campbell identified Brian Beals as the shooter is exposed by three simple facts. First, the story evolved over time, from not identifying anyone at all to having a clear visual of Brian Beals as he stood within a matter of feet of them in broad daylight after the shooting. Valerie Campbell and her son did not spontaneously remember more and more detail as the case proceeded to trial. This was the result of manipulation and fact-feeding by CPD officers and detectives.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 78.**

79. Second, CPD never had Valerie Campbell physically identify Brian Beals at any point in time prior to at trial. Under the circumstances, where you have a supposed eyewitness and a suspect in custody, there is no situation where a reasonable police officer would not have presented the suspect for identification either through a lineup, photo array, or at worst, a show-up. The fact that CPD did not do so indicates that Valerie Campbell could not legitimately identify Brian Beals on the night of the shooting; rather, it was only after the Defendant CPD Officers and Detectives had sufficiently manipulated her that she identified Brian Beals at trial.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 79.**

80. Finally, Antonio Campbell, who according to CPD's report, identified Brian Beals at his residence, was never asked to identify Brian Beals at trial. Together with the

prosecution's apparent decision not to call the older child, Cordell, who according to CPD

records, purportedly identified Brian Beals 30 minutes after the shooting, and the fact that

Antonio Campbell was not asked to identify Brian Beals at trial indicates that CPD knew he

could not reliably do so.

> **ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. Upon information and belief, the City admits that Antonio Campbell was never asked to identify Plaintiff at trial. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 80.**

### CPD'S *BRADY* VIOLATIONS

81.     In addition to fostering a false narrative used to convict Brian Beals through the

witnesses discussed above, the Defendant CPD Officers and Detectives committed at least three

egregious *Brady* violations.

> **ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 81.**

82.     First, Detective Ptak inspected the vehicle Brian Beals was driving during the

shooting and undoubtedly would have noticed the fresh bullet holes and grooves on the rear

passenger side of the vehicle. The existence of those bullet holes and grooves were exculpatory

evidence and, as a result, had to be produced to Brian Beals and his counsel. Detective Ptak,

however, did not document the bullet holes in any CPD reports, thereby burying crucial

evidence.

> **ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 82.**

83.     Second, Detective Ptak wrote a memo to the Chief of Detectives, stating, "[i]n

that the time of the arrest was within the two-hour time limit of the homicide[,] Gunshot Reside

Tests were taken from the arrestee who was subsequently charged with First Degree Murder."

The memo was approved by Commander Jon Burge, among others. The gunshot residue tests subsequently returned with "insignificant" findings. Such evidence is exculpatory and highly probative of the defense theory that Brian Beals did not fire a weapon, especially given that the arrest took place within approximately 30 minutes of the shooting, and there would have been no practical opportunity for anyone to remove the residue (assuming anyone would even appreciate that was a possibility). Under *Brady*, this memo had to be produced to Brian Beals and his counsel. It was not.

**ANSWER:** **Based upon records from the Chicago Police Department, the City admits that in a May 9 1989 memo to the Chief of Detectives, approved, in part, by Jon Burge, *inter alia*, Defendant Ptak stated that "[i]n that the time of the arrest was within the two hour limit of the homicide Gunshot Residue Tests were taken from the arrestee." Answering further, based on a report of the Federal Bureau of Investigation, the City admits that the amounts of gunshot residue detected on Plaintiff were "insignificant" and therefore "it could not be determined if [Plaintiff] discharged a firearm or was in an environment where gunshot primer residue was present." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 83.**

84.     Third, one of the Defendant CPD Officers and Detectives took Stevie Johnson to Valerie Campbell's hospital bed for a show up. No report of this event was created nor was it disclosed to Brian Beals or his counsel. This evidence is exculpatory because it shows that CPD had an alternative suspect and, more importantly, it is inconsistent with CPD's and the prosecution's narrative that Valerie Campbell immediately identified Brian Beals as the shooter.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 84.**

### A PATTERN AND PRACTICE OF UNCONSTITUTIONAL CONDUCT BY DETECTIVES PTAK AND DUFFIN

85.     To date, Detective Ptak has been involved in at least eight wrongful convictions, including some cases that were being investigated within a few months of the Campbell

shooting: Patrick Hampton, James Kluppelberg, Ronald Kitchen, Marvin Reeves, James Gibson, Nick Morfin, Matthew Sopron, and Wayne Antusas. Brian Beals is the ninth person (thus far known) who has been exonerated after being investigated and wrongly implicated by Detective Ptak.

**ANSWER:** **Upon information and belief, the City admits that Defendant Ptak was involved in some capacity in the investigations of Patrick Hampton, James Kluppelberg, Ronald Kitchen, Marvin Reeves, James Gibson, Nick Morfin, Matthew Sopron, and Wayne Antusas. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 85.**

86. *Patrick Hampton – December 1981*: Patrick Hampton was accused of violent sexual assault in December 1981 based on a misidentification. Mr. Hampton was exonerated in 2011 after serving nearly 20 years in prison. Detectives Ptak and Duffin were the only two officers named in Hampton's civil lawsuit, which ultimately settled in 2018.

**ANSWER:** **Upon information and belief, the City admits that Patrick Hampton was accused of sexual assault, Defendants Ptak and Duffin were named in a civil suit arising from his criminal conviction, Defendant Ptak was dismissed, on May 8, 2013, from the civil suit, and Hampton's civil lawsuit settled in 2018. The City lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 86.**

87. In the course of investigating the Hampton case, Detective Ptak visited the victim in the hospital – just as he visited Valerie Campbell in the hospital here – and used suggestive and coercive questioning techniques to secure a false identification. Detectives Ptak and Duffin also fabricated additional evidence in the Hampton case in an effort to bolster the victims' false identification, similar to how the surprise testimony Valerie Campbell offered at trial bolstered her (mis) identification of Brain Beals.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 87.**

88.     _James Kluppelberg – January 1988:_ Mr. Kluppelberg was coerced into falsely confessing to arson-murder by a group of officers, including Detective Ptak and Detective Duffin.  He was exonerated in 2012 after spending nearly 25 years in prison and was thereafter granted a certificate of innocence.  His civil lawsuit settled in 2018.

**ANSWER:     Upon information and belief, the City admits that Kluppelberg's civil lawsuit settled in 2017. The City lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 88.**

89.     The techniques used to coerce James Kluppelberg into confessing include physical abuse, which, in this case, was used against Mark Terrell and threatened against Stevie Johnson. The Kluppelberg conviction also involved the coercion of false witness statements and a conspiracy to fabricate false evidence, just as was done here with respect to Valerie Campbell's surprise testimony at trial and Detective Ptak's lies about the gun shot residue testing and the lack of bullet holes in the car Brian Beals was driving.

**ANSWER:      The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 89.**

90.     _Ronald Kitchen and Marvin Reeves – August 1988:_ Only three months before the Campbell shooting, Ronald Kitchen and Marvin Reeves were interrogated by a team of officers, including Detective Ptak, concerning the murders of two woman and three children. Both defendants were exonerated in 2009 and later granted certificates of innocence. Their civil lawsuits settled in 2013.

**ANSWER:     Upon information and belief, the City admits that Kitchen's civil lawsuit settled in 2015. The City lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 90.**

91.     The methods allegedly used during interrogation in the case against Kitchen and Reeves included beatings with a telephone book and a baton, just as was done to Mark Terrell here. While former Commander Burge is rightfully notorious for his official misconduct, the

*Reeves* Complaint alleges that he did not act alone; rather, "[s]pecifically, throughout the 1980s, a group of Chicago Police Officers in Area 2 under the command of [Detective] Jon Burge engaged in systematic torture and abuse in attempting to extract confessions from suspects to 'solve' crimes more expediently and to enhance their personal standing in the Department." Indeed, "[w]hen Burge was subsequently transferred to Area 3, the torture shifted to Area 3." The Campbell shooting was investigated by Area 3 in precisely this manner.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 91.**

92. *James Gibson – December 1989:* James Gibson was arrested and wrongfully convicted just one mile from the Campbell shooting. Detective Ptak was one of several Burge-era officers named in the complaint. Mr. Gibson was exonerated in 2019 and received a certificate of innocence in 2020. His civil case is pending.

**ANSWER:** **Upon information and belief, the City admits that Gibson filed a civil suit, and that Thomas Ptak's estate was dismissed from the suit on April 27, 2020. The City denies the allegations of misconduct in paragraph 92 to the extent they are directed against it. The City lacks knowledge or information sufficient to admit or deny the remaining allegations in Paragraph 92.**

93. In the *Gibson* case, one of the main witnesses against him appears to be the actual murderer, just as here, Stevie Johnson, one of the main witnesses against Brian Beals, appears to have been involved in the set up for the shooting. In the *Gibson* case, that same witness was released without charges and went on to commit another crime, just as Stevie Johnson was later arrested and found to be part of the massive cocaine drug ring. In particular, at the time of these events and continuing for years thereafter, Stevie Johnson was part of a massive cocaine drug ring "br[inging] in a million dollars a week" led by Erdogan Kurap. As part of a proffer given to the State's Attorney's Office in October 1992, Stevie Johnson testified that he got cocaine from Kurap, which he would sell in the neighborhood. After Stevie Johnson's proffer, Kurap and 20 of

his employees were indicted, and Kurap pled guilty and was sentenced to 30 years in prison. In exchange for Stevie Johnson's cooperation against Kurap, his conspiracy drug charges were dropped.

**ANSWER:** **The City lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 93.**

94. _Matthew Sopron, Nick Morfin, and Wayne Antusas – December 1995:_ In this case involving multiple defendants, Detective Ptak was part of a group of officers who interrogated a witness and coerced him into falsely implicating Matthew Sopron, Nick Morfin, and Wayne Antusas. All have since been exonerated, and Nick Morfin and Wayne Antusas have been granted certificates of innocence.

**ANSWER:** **The City lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 94.**

95. _James Marshall:_ In addition to the eight individuals above who were wrongfully convicted and exonerated, in part due to police misconduct of Detective Ptak and in some instances Detective Duffin, both detectives are also directly implicated in the torture of James Marshall on November 7, 1988, just 9 days before the Campbell shooting.

**ANSWER:** **The City lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 95.**

96. In the Marshall investigation, Detectives Ptak, Duffin, and others immediately focused on Marshall as the one and only suspect, ignoring evidence of other possible offenders that was contained in the street file. This, of course, is similar to the instant case in which Detectives Ptak and Duffin ignored clear evidence of a third party shooting at Brian that day, as witnessed by many members of the community. Further, during their interrogation of Marshall at Area 3, he was beaten and threatened by numerous officers, similar to Mark Terrell and Stevie Johnson. Also, similar to the prosecution's theory in the Campbell shooting, which does not

make sense, the timing in Marshall's case was so "nonsensical that it must have been fabricated by the Area 3 detectives." In a post-conviction hearing, when asked "whether Detective Duffin planted evidence in the case of James Marshall," Detective Paladino asserted his Fifth Amendment rights.

**ANSWER:** **The City lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 96.**

97.     The pattern and practice described in the cases discussed above is the same pattern and practice that was used to convict Brian Beals.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 97.**

**BRIAN BEALS' EXONERATION**

98.     On December 12, 2023, Brian Beals' Petition to Vacate his convictions was granted without opposition of the Cook County Sate's Attorney's office.

**ANSWER:** **Upon information and belief, the City admits that on December 12, 2023, Plaintiff's Petition to Vacate Convictions was granted. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 98.**

99.     At the same time, the Cook County State's Attorneys' Office made the decision to dismiss all charges against him based upon its knowledge that Brian is innocent and that no reasonable jury would convict him.

**ANSWER:** **Upon information and belief, the City admits that the charges against Plaintiff were dismissed. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 99.**

**COUNT 1**
**42 U.S.C. § 1983 – Fabrication of Evidence Through Witness Coercion and Manipulation Due Process Clause of Fifth and Fourteenth Amendments Against the Defendant CPD Officers and Detectives**

100.     Brian Beals hereby incorporates by reference Paragraphs 1 through 99 as if fully set forth herein.

**ANSWER:     The City incorporates by reference its answers to Paragraph 1 through 99 of Plaintiff's Complaint as if fully set forth herein.**

101.     As more fully described above, the Defendant CPD Officers and Defendants, acting individually, jointly, and in conspiracy, while under color of law and within the scope of their employment, deprived Brian Beals of his constitutional right to a fair trial in violation of the Fifth and Fourteenth Amendments.

**ANSWER:     The City incorporates its answers to the foregoing paragraphs as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 101.**

102.     Among other things, the Defendant Officers and Detectives, acting individually, jointly, and in conspiracy with one another:

(a)     Manipulated Valerie Campbell into identifying Brian Beals as the shooter by feeding her false information while she was in a vulnerable state;

(b)     Manipulated Valerie Campbell into giving a false statement that she saw Brian Beals with his arm out of the window, holding a gun, and shooting at them, when she did not see that;

(c)     Manipulated Valerie Campbell into giving false testimony at trial that she saw Brian Beals get out of his car after the shooting and standing within a couple of feet from her so as to give her an opportunity to identify him, when that event did not occur;

(d)     Manipulated and/or coerced Derrik [sic] Lewis into falsely testifying that he and Valerie Campbell identified Brial Beals, or the "fat man," as the shooter, through the use of intimidating tactics while questioning him;

(e)     Fabricated evidence tat Derrik [sic] Lewis identified Brial Beals at the Beals' residence when that did not occur;

(f)     Manipulated and/or coerced Stevie Hohnson into falsely testifying that Valerie Campbell told him that Brian Beals was the shooter by threating

Stevie Johnson and using intimidating tactics while questioning him; and

    (g)    Manipulated Antonio Campbell to identify Brian Beals as the shooter by feeding him false information while he was plainly subject to manipulation as a child whose brother and mother had just been shot;

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 102 and all its sub-parts.**

103.    Manipulating and intimidating witnesses was part of CPD's *modus operandi* in this case. Here, the Defendant CPD Officers and Detectives tried to coerce Stevie Johnson into falsely saying that he was driving westbound in front of Brian Beals and that Brian Beals was chasing after his car and shooting at it. At the same time, Detective Duffin planted a false story in the Chicago Tribune that Brian Beals was chasing Stevie Johnson westbound down 60th Street. This fiction was entirely created by the Defendant CPD Officers and Detectives as there was no one who ever gave any statement to this effect and is indicative of their malicious intent of wrongfully arresting Brian Beals and having him prosecuted and convicted.

**ANSWER:** **The City denies that the Chicago Police Department has a *modus operandi* in this or any other case of manipulating and intimidating witnesses. To the extent additional allegations in this paragraph are directed against the City, the City denies these allegations. Answering further, the City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 103.**

104.    Additionally, the Defendant CPD Officers and Detectives, and potentially other unknown officers or detectives, physically tortured Brian Beals' friend, Mark Terrell, in an unsuccessful effort to get him to testify against Brian Beals.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 104.**

105.     Absent this misconduct, Brian Beals would not have been arrested, indicted, prosecuted, or convicted of these crimes. At no point in time was there any credible evidence giving rise to probable cause to suspect Brian Beals of these crimes. Thus, as a direct and proximate result of the misconduct by the Defendant CPD Officers and Detectives, Brian Beals was deprived of his constitutional right to a fair trial and was ultimately convicted of crimes he did not commit.

**ANSWER:     Based upon records from the Chicago Police Department, the City denies that "[a]t no point in time was there any credible evidence giving rise to probable cause to suspect Brian Beals of these crimes." To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 105.**

106.     The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Brian Beals' innocence.

**ANSWER:      The City incorporates its answers to this Count as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 106.**

107.     The misconduct alleged herein proximately caused Brian Beals to suffer injuries, including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damages

**ANSWER:     The City incorporates its answers to this Count as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 107.**

## COUNT 2
### 42 U.S.C. § 1983 – Fabrication of Evidence Through False
### Reporting Due Process Clause of Fifth and Fourteenth Amendments
### Against the Defendant CPD Officers and Detectives

108.     Brian Beals hereby incorporates by reference Paragraphs 1 through 99 as if fully set forth herein.

**ANSWER:     The City incorporates by reference its answers to Paragraph 1 through 99 of Plaintiff's Complaint as if fully set forth herein.**

109.     As more fully described above, the Defendant CPD Officers and Detectives, acting individually, jointly, and in conspiracy, while under color of law and within the scope of their employment, deprived Brian Beals of his constitutional right to a fair trial in violation of the Fifth and Fourteenth Amendments.

**ANSWER:     The City incorporates its answers to the foregoing paragraphs as if fully restated here. The City incorporates its answers to this Count as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 109.**

110.     Among other things, the Defendant CPD Officers and Detectives, acting individually, jointly, and in conspiracy with one another:

(a)     Falsified a report that Derrik [sic] Lewis identified Brian Beals as the "fat man";

(b)      Falsified a report that Antonio Campbell identified Brial Beals as the shooter;

(c)     Falsified a report that Cordell Campbell identified Brian Beals as the shooter and

(d)     Falsified multiple reports that Valerie Campbell identified Brain Beals as the shooter.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 110.**

111.   Absent this misconduct, Brian Beals would not have been arrested, indicted, prosecuted, or convicted these crimes. At no point in time was there any credible evidence giving rise to probable cause to suspect Brian Beals of these crimes. Thus, as a direct and proximate result of the misconduct by the Defendant CPD Officers and Detectives, Brian Beals was deprived of his constitutional right to a fair trial and was ultimately convicted of crimes he did not commit.

**ANSWER:** **Based upon records from the Chicago Police Department, the City denies that "[a]t no point in time was there any credible evidence giving rise to probable cause to suspect Brian Beals of these crimes." To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 111.**

112.   The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Brian Beals' innocence.

**ANSWER:** **The City incorporates its answers to this Count as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 112.**

113.   The misconduct alleged herein proximately caused Brian Beals to suffer injuries, including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damages.

**ANSWER:** **The City incorporates its answers to this Count as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 113.**

## COUNT 3
### 42 U.S.C. § 1983 – Brady Violations
### Due Process Clause of Fifth and Fourteenth Amendment
### Against the Defendant CPD Officers and Detectives

114. Brian Beals hereby incorporates by reference Paragraphs 1 through 99 as if fully set forth herein.

**ANSWER:** **The City incorporates by reference its answers to Paragraph 1 through 99 of Plaintiff's Complaint as if fully set forth herein.**

115. As more fully described above, the Defendant CPD Officers and Detectives, individually, jointly, and in conspiracy, while under color of law and within the scope of their employment, deprived Plaintiff Brian Beals of his constitutional right to a fair trial in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Brian Beals, his counsel, and the prosecution.

**ANSWER:** **The City incorporates its answers to the foregoing paragraphs as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 115.**

116. As set forth above, the Defendant CPD Officers and Detectives withheld from Brian Beals and the prosecution exculpatory evidence including:

(a) The existence of fresh bullet holes and groovers in the back passenger side of the car Beals was driving at the time of the shooting;

(b) The memo from Detective Ptak confirming that the gunshot residue test of Brian Beals was taken within the two-hour window, which CPD deems relevant;

(c) That one or more of the Defendant CPD Officers and Detectives took Stevie Johnson to Valerie Campbell's hospital room for a show-up; and

(d)     That they manipulated false statements and identifications from Valerie
        Campbel, Antonio Campbell, Derrik [sic] Lewis, and Stevie Johnson.

**ANSWER:      To the extent the allegations in this paragraph are directed against the City,
the City denies these allegations. The City lacks knowledge or information
sufficient to form a belief as to the truth of the remaining allegations
contained in Paragraph 116.**

117.    The aforementioned evidence is exculpatory as it tends to prove Brian Beals'

innocence and was therefore required to be produced to Brian Beals and his counsel. None of

this evidence was so produced.

**ANSWER:      To the extent the allegations in this paragraph are directed against the City,
the City denies these allegations. The City lacks knowledge or information
sufficient to form a belief as to the truth of the remaining allegations
contained in Paragraph 117.**

118.    The misconduct described above was objectively unreasonable and was

undertaken intentionally, with malice, willful indifference to Brian Beals' constitutional rights and

in total disregard of the truth and Brian Beals' innocence.

**ANSWER:      To the extent the allegations in this paragraph are directed against the City,
the City denies these allegations. The City lacks knowledge or information
sufficient to form a belief as to the truth of the remaining allegations
contained in Paragraph 118.**

119.    Through this misconduct, the Defendant CPD Officers and Detectives directly

and proximately caused Brian Beals' unjust criminal conviction and wrongful imprisonment.

**ANSWER:      To the extent the allegations in this paragraph are directed against the City,
the City denies these allegations. The City lacks knowledge or information
sufficient to form a belief as to the truth of the remaining allegations
contained in Paragraph 119.**

120.    Without the misconduct of withholding exculpatory evidence, Brian Beals would

not have been prosecuted or convicted.

**ANSWER:      To the extent the allegations in this paragraph are directed against the City,
the City denies these allegations. The City lacks knowledge or information
sufficient to form a belief as to the truth of the remaining allegations**

contained in Paragraph 120.

121.     By withholding exculpatory evidence from Brian Beals, the Defendant CPD

Officers and Detectives deprived Brian Beals of his constitutional right to a fair trial in violation

of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States

Constitution.

**ANSWER:     To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 121.**

122.     Absent this misconduct, Brian Beals would not have been arrested, indicted,

prosecuted, or convicted of these crimes. At no point in time was there any credible evidence

giving rise to probable cause to suspect Brian Beals of these crimes. Thus, as a direct and

proximate result of the misconduct of the Defendant CPD Officers and Detectives, Brian Beals

was deprived of his constitutional right to a fair trial and was ultimately convicted of crimes he

did not commit.

**ANSWER:     Based upon records from the Chicago Police Department, the City denies that "[a]t no point in time was there any credible evidence giving rise to probable cause to suspect Brian Beals of these crimes." To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 122.**

123.     The misconduct by the Defendant CPD Officers and Detectives proximately

caused Brian Beals to suffer injuries, including but not limited to, loss of liberty, great mental

anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and

other continuing injuries and damages.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 123.**

<u>COUNT 4</u>
42 U.S.C. § 1983 – Unlawful Detention
Fourth and Fourteenth Amendments
Against the Defendant CPD Officers and Detectives

124.    Brian Beals hereby incorporates by reference Paragraphs 1 through 99 as if fully set forth herein.

**ANSWER:** **The City incorporates by reference its answers to Paragraph 1 through 99 of Plaintiff's Complaint as if fully set forth herein.**

125.    As more fully described above, the Defendant CPD Officers and Detectives, acting individually, jointly, and in conspiracy, while under color of law and within the scope of their employment, accused Brian Beals of criminal activity and exerted influence to initiate, continue, and perpetuate his unlawful detention without any probable cause, by using evidence which they knew to be false, and in spite of the fact that they knew Brian Beals was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

**ANSWER:** **Based upon records from the Chicago Police Department, the City denies that "[a]t no point in time was there any credible evidence giving rise to probable cause to suspect Brian Beals of these crimes." The City incorporates its answers to the foregoing paragraphs as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 125.**

126.    In so doing, the Defendant CPD Officers and Detectives caused Brian Beals to be unlawfully detained and deprived of his liberty without probable cause.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 126.**

127.    Absent this misconduct, Brian Beals would not have been arrested, indicted, prosecuted, or convicted of these crimes. At no point in time was there any credible evidence giving rise to probable cause to suspect Brian Beals of these crimes. Thus, as a direct and proximate result of the misconduct by the Defendant CPD Officers and Detectives, Brian Beals was deprived of his constitutional right to a fair trial and was detained and imprisoned without probable cause.

**ANSWER:    Based upon records from the Chicago Police Department, the City denies that "[a]t no point in time was there any credible evidence giving rise to probable cause to suspect Brian Beals of these crimes." To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 127.**

128.    The Defendant CPD Officers' and Detectives' misconduct was objectively unreasonable, and they acted intentionally and with willful indifference to Brian Beals' constitutional rights and innocence.

**ANSWER:    To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 128.**

129.    The misconduct by the Defendant CPD Officers and Detectives directly and proximately caused Brian Beals to suffer injuries, including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damages.

**ANSWER:    To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 129.**

## COUNT 5
### 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights
### Against the Defendant CPD Officers and Detectives

130.    Brian Beals hereby incorporates by reference Paragraphs 1 through 99 as if fully set forth herein.

**ANSWER:    The City incorporates by reference its answers to Paragraph 1 through 99 of Plaintiff's Complaint as if fully set forth herein.**

131.    The Defendant CPD Officers and Detectives, and other co-conspirators, not yet known to Brian Beals, reached an agreement amongst themselves to coerce, induce, and fabricate false evidence in the form of witness statements, identifications, and testimony for the purpose of framing Brian Beals for crimes he did not commit.

**ANSWER:    To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 131.**

132.    The Defendant CPD Officers and Detectives, other co-conspirators, not yet known to Brian Beals, reached an agreement amongst themselves to deprive Brian Beals of material exculpatory evidence and information to which he was lawfully entitled, and to conceal their misconduct from Brian Beals, all in violation of Brian Beals' constitutional rights as described above.

**ANSWER:    To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 132.**

133.    The Defendant CPD Officers and Detectives, acting in concert with unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

**ANSWER:    To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations**

contained in Paragraph 133.

134.    In furtherance of that conspiracy, each of the co-conspirators committed overt acts

and was a willful participant in joint activity.

**ANSWER:    To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 134.**

135.    The misconduct described above was objectively unreasonable and was

undertaken intentionally and with willful indifference to Brian Beals' constitutional rights.

**ANSWER:    To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 135.**

136.    As a direct and proximate result of this illicit agreement, Brian Beals suffered

injuries including but not limited to, loss of liberty, great mental anguish, humiliation,

degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries

and damages.

**ANSWER:    To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 136.**

## COUNT 6
### 42 U.S.C. §§ 1983, 1986 – Failure to Intervene
### Against the Defendant CPD Officers and Detectives

137.    Brian Beals hereby incorporates by reference Paragraphs 1 through 99 as if fully set

forth herein.

**ANSWER:    The City incorporates by reference its answers to Paragraph 1 through 99 of Plaintiff's Complaint as if fully set forth herein.**

138.    In the manner described above, the Defendant CPD Officers and Detectives,

together with other CPD officers, stood by without intervening to prevent violations of Brian

Beals' constitutional rights, even though they had the ability and opportunity to do so.

**ANSWER:** **The City incorporates its answers to the foregoing paragraphs as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 138.**

139.    The Defendant CPD Officers' and Detectives' conduct was objectively

unreasonable.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 139.**

140.    The Defendant CPD Officers and Detectives acted intentionally and with willful

indifference to Brian Beals' constitutional rights.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 140.**

141.    The Defendant CPD Officers and Detectives, knowing of the conspiracy to frame

Brian Beals, and having the power to prevent or aid in preventing the commission of the acts in

furtherance of that conspiracy, neglected and/or refused to do so, in violation of 42 U.S.C. §

1986.

**ANSWER:** **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 141.**

142.    As a result of the Defendant CPD Officers' and Detectives' failures to intervene,

as more fully described above, Brian Beals suffered loss of liberty, great mental anguish,

humiliation, degradation, physical and emotional pain and suffering, lost wages, and other

continuing injuries and damage.

ANSWER:    **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 142.**

**COUNT 7**
**42 U.S.C. § 1983 – Monell Claim**
**Against City of Chicago**

143.    Brian Beals hereby incorporates by reference Paragraphs 1 through 142 as if fully set forth herein.

ANSWER:    **The City incorporates by reference its answers to Paragraph 1 through 142 of Plaintiff's Complaint as if fully set forth herein.**

144.    At all material times, the Defendant CPD Officers and Detectives were clothed with the authority of state law and acting under color and authority of state law as agents and employees of CPD.

ANSWER:    **Upon information and belief, the City admits that the Defendant CPD Officers and Detectives were employees of the Chicago Police Department. The City denies the remaining allegations contained in Paragraph 144.**

145.    The Defendant CPD Officers and Detectives committed and caused the commission of the above alleged constitutional violations pursuant to one or more *de facto* policies, practices, and/or customs of the City of Chicago.

ANSWER:    **The City denies the allegations contained in Paragraph 145.**

146.    At the time of Brian Beals' arrest, the City of Chicago had *de facto* policies or practices that included: (a) procuring false witness testimony; (b) concealing exculpatory evidence; (c) manipulating witnesses to obtain false identifications from witnesses; (d) manipulating witnesses to influence their testimony; and (e) using these tactics to secure the arrest, prosecution, and conviction of a person without regard to their actual guilt or innocence.

ANSWER:    **The City denies the allegations contained in Paragraph 146.**

147.     At all relevant times, there was a widespread custom and practice of: coercing, manipulating, threatening, and pressuring witnesses to make false witness statements and concealing exculpatory evidence.

**ANSWER:     The City denies the allegations contained in Paragraph 147.**

148.     At all relevant times, as set forth above, members of CPD, including but not limited to, the Defendant CPD Officers and Detectives, routinely manufactured evidence against innocent persons by coercing, manipulating, and threatening witnesses to make false statements implicating innocent persons knowing full well that those statements were false.

**ANSWER:     The City incorporates its answers to the foregoing paragraphs as if fully restated here. The City denies the allegations contained in Paragraph 148.**

149.     As a matter of widespread custom and practice, members of CPD, including but not limited to the Defendant CPD Officers and Detectives, fabricated narratives that were fed to 35 vulnerable witnesses who then adopted those fabricated narratives as their own for the purpose of wrongly convicting an innocent person.

**ANSWER:     The City denies the allegations contained in Paragraph 149.**

150.     At all relevant times, and as set forth above, members of the CPD, including but not limited to the Defendant CPD Officers and Detectives, routinely and systematically suppressed exculpatory and/or impeaching material in violation of *Brady*.

**ANSWER:     The City incorporates its answers to the foregoing paragraphs as if fully restated here. The City denies the allegations contained in Paragraph 150.**

151.     Consistent with the *de facto* policies and practices described in the preceding paragraphs, employees of the City of Chicago, including but not limited to the Defendant CPD Officers and Detectives, fabricated evidence and procured false statements from witnesses knowing full well their statements were false and would lead to the wrongful conviction of Brian

Beals.

**ANSWER:** **The City incorporates its answers to the foregoing paragraphs as if fully restated here. The City denies the allegations contained in Paragraph 151.**

152.     At all relevant times, as set forth above, members of CPD, including but not limited to the Defendant CPD Officers and Detectives, routinely and systematically suppressed exculpatory and/or impeaching material by intentionally concealing reports, memos, and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these files were also withheld from the State's Attorney's Office and from criminal defendants and were not maintained as part of the official file.

**ANSWER:** **The City incorporates its answers to the foregoing paragraphs as if fully restated here. The City denies the allegations contained in Paragraph 152.**

153.     Consistent with the *de facto* municipal policies and practices described in the preceding paragraph, employees of the City of Chicago, including but not limited to the Defendant CPD Officers and Detectives, concealed exculpatory evidence from Brian Beals.

**ANSWER:** **The City incorporates its answers to the foregoing paragraphs as if fully restated here. The City denies the allegations contained in Paragraph 153.**

154.     At all relevant times, as set forth above, members of CPD, including but not limited to the Defendant CPD Officers and Detectives, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to narratives fabricated by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

**ANSWER:** **The City incorporates its answers to the foregoing paragraphs as if fully restated here. The City denies the allegations contained in Paragraph 154.**

155.    Consistent with the *de facto* municipal policies and practices described in the preceding paragraph, employees of the City of Chicago, including but not limited to the Defendant CPD Officers and Detectives, manipulated, tricked, and improperly coerced false statements and identifications given by Valerie Campbell, Antonio Campbell, Derrik [sic] Lewis, and Stevie Johnson.

**ANSWER:    The City incorporates its answers to the foregoing paragraphs as if fully restated here. The City denies the allegations contained in Paragraph 155.**

156.    At all relevant times, the City of Chicago and CPD failed to seriously discipline any CPD officers for any misconduct relating to the investigation of and/or involvement with charging innocent persons with serious crimes.

**ANSWER:    The City denies the allegations contained in Paragraph 156.**

157.    Prior to and during 1988 (the year in which Brian Beals was falsely charged with the crimes at issue here), the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. At that time, the Chicago Police Office of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Moreover, the Chicago police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

**ANSWER:    The City denies the allegations contained in Paragraph 157.**

158.    As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence within CPD. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the same type of misconduct at issue here.

**ANSWER:    The City denies the allegations contained in Paragraph 158.**

159.     As a result of the City of Chicago's established practices and *de facto* policies of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the CPD, CPD officers, including, but not limited to, the Defendant CPD Officers and Detectives, came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of CPD act with impunity when they violate the constitutional and civil rights of citizens.

**ANSWER:     The City denies the allegations contained in Paragraph 159.**

160.     The City of Chicago and CPD failed in 1988 and in the years prior to and after to properly train, supervise, discipline, monitor, or otherwise control police officers engaged in police misconduct, particularly officers such as Detective Ptak and Detective Duffin here, who were repeatedly accused of police misconduct, making false arrests, manipulating witnesses into giving false statements and identifications, destroying or withholding evidence, fabricating police reports, providing false testimony, and otherwise engaging in malicious prosecutions and wrongful convictions.

**ANSWER:     The City denies the allegations contained in Paragraph 160.**

161.     The need to properly train, supervise, discipline, monitor, or otherwise control police officers engaged in this type of conduct was and remains obvious.

**ANSWER:     The City admits that providing its police officers with adequate training is necessary but denies that it failed to provide adequate training. The City denies the remaining allegations contained in Paragraph 161.**

162. By failing to properly train, supervise, discipline, monitor, or otherwise control police officers such as the Defendant CPD Officers and Detectives, including specifically, Detective Ptak and Detective Duffin, the City of Chicago and CPD effectively condoned, ratified, and sanctioned the kind of misconduct that the Defendant CPD Officers and Detectives committed against Brian Beals in this case.

**ANSWER:** **The City denies the allegations contained in Paragraph 162.**

163. The City of Chicago and CPD failed to act to remedy the patterns of abuse described above, despite actual knowledge of the pattern of misconduct, thereby perpetuating the unlawful practices and creating a *de facto* policy condoning the misconduct at issue here.

**ANSWER:** **The City denies the allegations contained in Paragraph 163.**

164. These *de facto* policies and practices described above were consciously approved by the City of Chicago and CPD policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

**ANSWER:** **The City incorporates its answers to the foregoing paragraphs as if fully restated here. The City denies the allegations contained in Paragraph 164.**

165. The actions of the Defendant CPD Officers and Detectives were done pursuant to one or more interrelated *de facto* policies, practices, and/or customs of the City of Chicago and CPD which were ratified by policymakers for the City of Chicago and CPD with final policymaking authority. These *de facto* policies and practices include:

(a) conducting physically and psychologically, illegal, or improperly coercive interrogations of witnesses to obtain false statements and wrongful convictions;

(b) manufacturing and fabricating false witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony;

(c) covering up the true nature of witness interviews and/or interrogations;

(d) suppressing exculpatory evidence;

(e)  filing false police reports and giving false statements and testimony about such false reports to support false charges and wrongful convictions;

(f)  fabricating evidence to support false charges and wrongful convictions; and

(g)  lying about police misconduct during investigations of the same and to cover up the true nature of police misconduct.

**ANSWER:  The City denies the allegations contained in Paragraph 165, including all its subparts.**

166.  The policies and practices described above were maintained and implemented by the City of Chicago and CPD with deliberate indifference to Brian Beals' constitutional rights.

**ANSWER:  The City incorporates its answers to the foregoing paragraphs as if fully restated here. The City denies the allegations contained in Paragraph 166.**

167.  The aforementioned *de facto* policies, practices, and/or customs of the City of Chicago and CPD were the moving force behind the Defendant CPD Officers and Detectives depriving Brian Beals of his constitutional rights.

**ANSWER:  The City denies the allegations contained in Paragraph 167.**

168.  These patterns and practices were so widespread, permanent, and well-settled as to constitute a custom with the force of law.

**ANSWER:  The City denies the allegations contained in Paragraph 168.**

169.  These patterns and practices permeate a critical mass of the institutional body of the City of Chicago and its Police Department.

**ANSWER:  The City denies the allegations contained in Paragraph 169.**

170.  It was obvious that these patterns and practices would leas to constitutional violations.

**ANSWER:  The City denies the allegations contained in Paragraph 170.**

171.     As a direct and proximate result of the City of Chicago and CPD's actions, Brian Beals suffered injuries including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damages for which the City of Chicago is liable.

**ANSWER:     The City denies the allegations contained in Paragraph 171.**

### COUNT 8
### State Law – Malicious Prosecution
### Against the Defendant CPD Officers and Detectives

172.     Brian Beals hereby incorporates by reference paragraphs 1 thorugh 99 as if fully set forth herein.

**ANSWER:     The City incorporates by reference its answers to Paragraph 1 through 99 of Plaintiff's Complaint as if fully set forth herein.**

173.     At no point in time, was there any credible evidence giving rise to probable cause to suspect Brian Beals of the crimes for which he was arrested, charged, and prosecuted.

**ANSWER:     Based upon records from the Chicago Police Department, the City denies the allegations contained in Paragraph 173.**

174.     As more fully described above, the Defendant CPD Officers and Detectives caused Brian Beals to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in injury to Brian Beals.

**ANSWER:     The City incorporates its answers to the foregoing paragraphs as if fully restated here. Based upon records from the Chicago Police Department, the City denies that "[a]t no point in time was there any credible evidence giving rise to probable cause to suspect Brian Beals of these crimes." The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 174.**

175.     On December 12, 2023, said judicial proceedings were ultimately terminated in Brian Beals' favor and in a manner indicative of Brian Beals' innocence.

**ANSWER:** **The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 175.**

176.     The Defendant CPD Officers and Detectives accused Brian Beals of crimes, knowing that he was innocent of those crimes. The Defendant CPD Officers and Detectives manipulated witness statements and identifications used against Brian Beals and withheld exculpatory evidence.

**ANSWER:**     **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 176.**

177.     The Defendant CPD Officers and Detectives made statements to prosecutors with the intent of pressuring and exerting influence to institute and continue judicial proceedings against Brian Beals.

**ANSWER:**     **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 177.**

178.     The Defendant CPD Officers and Detectives continued the criminal proceeding against Brian Beals despite the absence of probable cause that he had committed the crimes he was accused of.

**ANSWER:**     **Based upon records from the Chicago Police Department, the City denies that there was an absence of probable cause that Beals had committed the crimes he was accused of. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 178.**

179.     This misconduct by the Defendant CPD Officers and Detectives was undertaken with malice, willfulness, and reckless indifference to Brian Beals' rights.

**ANSWER:**     **To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations**

contained in Paragraph 179.

180.    As a direct and proximate result of this misconduct, Brian Beals suffered injuries, including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damage.

**ANSWER:     To the extent the allegations in this paragraph are directed against the City, the City denies such allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 180.**

## COUNT 9

### Intentional Infliction of Emotional Distress
### Against the Defendant CPD Officers and Detectives

181.    Brian Beals hereby incorporates by reference paragraphs 1 through 99 as if fully set forth herein.

**ANSWER:     The City incorporates by reference its answers to Paragraph 1 through 99 of Plaintiff's Complaint as if fully set forth herein.**

182.    The acts and conduct of the Defendant CPD Officers and Detectives as set forth above were extreme and outrageous. The Defendant CPD Officers and Detectives intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Brian Beals.

**ANSWER:     The City incorporates its answers to the foregoing paragraphs as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 182.**

183.    The Defendant CPD Officers' and Detectives' actions and conduct directly and proximately caused severe emotional distress to Brian Beals, and thereby constituted intentional infliction of emotional distress.

**ANSWER:     To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information**

**sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 183.**

184.     The misconduct was undertaken with malice, willfulness, and reckless

indifference to Brian Beals' rights.

**ANSWER:     To the extent the allegations in this paragraph are directed against the City, the City denies such allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 184.**

185.     As a direct and proximate result of the Defendant CPD Officers' and Detectives'

wrongful acts, Brian Beals suffered injuries, including but not limited to emotional distress.

**ANSWER:     To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 185.**

## COUNT 10

### Willful and Wanton Conduct
### Against the Defendant CPD Officers and Detectives

186.     Brian Beals hereby incorporates by reference paragraphs 1 through 99 as if fully

set forth herein.

**ANSWER:     The City incorporates by reference its answers to Paragraph 1 through 99 of Plaintiff's Complaint as if fully set forth herein.**

187.     At all relevant times, the Defendant CPD Officers and Detectives had a duty to

refrain from willful and wanton conduct.

**ANSWER:     The allegations in this paragraph are a legal conclusion to which no answer is required. To the extent and answer is required, the City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 187.**

188.     Notwithstanding, the Defendant CPD Officers and Detectives acted willfully and

wantonly through a course of conduct, as more fully described above, that showed an utter

indifference to, or conscious disregard of Brian Beals' rights.

**ANSWER:** **The City incorporates its answers to the foregoing paragraphs as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 188.**

189.    As a result of the Defendant CPD Officers' and Detectives' misconduct, as more fully described above, Brian Beals suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damage.

**ANSWER:** **The City incorporates its answers to the foregoing paragraphs as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 189.**

<u>**COUNT 11**</u>
**Civil Conspiracy**
**Against the Defendant CPD Officers and Detectives**

190.    Brian Beals hereby incorporates by reference paragraphs 1 through 98 as if fully set forth herein.

**ANSWER:** **The City incorporates by reference its answers to Paragraph 1 through 99 of Plaintiff's Complaint as if fully set forth herein.**

191.    As more fully described above, the Defendant CPD Officers and Detectives, acting in concert with one another and other co-conspirators, conspired to accomplish an unlawful purpose by unlawful means.

**ANSWER:** **The City incorporates its answers to the foregoing paragraphs as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 191.**

192.    In furtherance of the conspiracy, the Defendant CPD Officers and Detectives

committed overt acts and were otherwise willing participants in joint activity.

**ANSWER:    To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 192.**

193.    The misconduct was undertaken with malice, willfulness, and reckless

indifference to Brian Beals' rights.

**ANSWER:    To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 193.**

194.    As a result of this conspiracy, as more fully described above, Brian Beals suffered

loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and

suffering, lost wages, and other continuing injuries and damage.

**ANSWER:    The City incorporates its answers to the foregoing paragraphs as if fully restated here. To the extent the allegations in this paragraph are directed against the City, the City denies these allegations. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 194.**

## COUNT 12
### *Respondeat Superior*
### Against City of Chicago

195.    Brian Beals hereby incorporates by reference paragraphs 1 through 193 as if fully

set forth herein.

**ANSWER:    The City incorporates by reference its answers to Paragraph 1 through 194 of Plaintiff's Complaint as if fully set forth herein.**

196.    When they committed the acts alleged in this Complaint, the Defendant CPD

Officers and Detectives were members and agents of the Chicago Police Department, an agency

of the City of Chicago, acting at all relevant times within the scope of their employment and

under color of law.

**ANSWER:** **Upon information and belief, the City admits that the Defendant CPD Officers and Detectives were employees of the City of Chicago. The allegation that Defendants were acting, at all relevant times, within the scope of their employment and under color of law is a legal conclusion to which no answer is required. To the extent an answer is required, the City lacks knowledge or information sufficient to form a belief as to the truth of the legal conclusion. The City denies the remaining allegations contained in Paragraph 196.**

197.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

**ANSWER:** **The allegations in this paragraph are a legal conclusion for which no answer is required. To the extent an answer is required, the City denies the allegations contained in Paragraph 197.**

198.     As a direct and proximate result of this misconduct, Brian Beals suffered injuries, including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damages.

**ANSWER:** **The City denies the allegations contained in Paragraph 198.**

<u>**COUNT 13**</u>
**Indemnification**
**Against City of Chicago**

199.     Plaintiff hereby incorporates by reference paragraphs 1 through 198 as if fully set forth herein.

**ANSWER:** **The City incorporates by reference its answers to Paragraph 1 through 198 of Plaintiff's Complaint as if fully set forth herein.**

200.     Illinois law provides that public entities must pay any tort judgment for compensatory damages for which its employees are liable based upon the employees' misconduct committed within the scope of their employment activities.

**ANSWER:** The City states that the allegations in this paragraph contain vague, incomplete, and/or incorrect statements of law, and are, therefore, denied.

201. The Defendant CPD Officers and Detectives were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

**ANSWER:** Upon information and belief, the City admits that the Defendant CPD Officers and Detectives were employees of the City of Chicago. The allegation that Defendants were acting, at all relevant times within the scope of their employment, is a legal conclusion to which no answer is required. To the extent an answer is required, the City lacks knowledge or information sufficient to form a belief as to the truth of the legal conclusion. The City denies the remaining allegations contained in Paragraph 201.

202. Defendant City of Chicago is responsible to pay any judgment entered against the Defendant CPD Officers and Detectives.

**ANSWER:** The City denies the allegations contained in Paragraph 202.

## AFFIRMATIVE DEFENSES

1. The City is not liable to Plaintiff if its employees or agents are not liable to Plaintiff. 745 ILCS 10/2-109.

2. Plaintiff has a duty to mitigate his damages, and any damages awarded to Plaintiff would be required to be reduced by any amount by which the damages could have been lessened by Plaintiff's failure to take reasonable action to minimize those damages.

3. To the extent any injuries or damages claimed by Plaintiff were proximately caused, in whole or in part, by any wrongful conduct on the part of Plaintiff, any verdict or judgment obtained by Plaintiff based on any finding of "reckless" willful and wanton behavior, as opposed to "intentional" willful and wanton behavior, must be reduced by application of the principles of comparative fault, by an amount commensurate with the degree of fault attributed to Plaintiff by the jury in this case. *See Poole v. City of Rolling Meadows*, 167 Ill.2d 41, 656 N.E.2d 768, 212

Ill.Dec. 171 (1995).

    4. Under Illinois law, the City is not liable for the conduct committed by employees not acting within the scope of their employment. *Wright v. City of Danville*, 174 Ill.2d 392, 221 Ill.Dec. 203, 675 N.E.2d 110 (1996).

    5. The City is immune from the imposition of punitive damages under both state and federal law. Punitive damages cannot be imposed against a municipality in a Section 1983 action. *City of Newport v. Fact Concerts, Inc*., 453 U.S. 247, 271 (1981). Moreover, under Illinois law, the City cannot be required to indemnify an employee for punitive or exemplary damages, nor may it pay judgment for punitive damages on behalf of an employee. 745 ILCS 10/2-102.

    6. Plaintiff's claims are barred or limited by the applications of the doctrines of waiver, *res judicata*, collateral estoppel, and/or judicial estoppel.

    7. Plaintiff's failure to intervene claim has no basis in the Constitution as "[f]ailure to intervene sounds like vicarious liability," which would of course be untenable, as "[t]he Supreme Court has held many times that Section 1983 supports only direct, and not vicarious, liability." *Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring).

    8. Plaintiff's claims as alleged in his Complaint are barred in whole or in part by the applicable statute of limitations.

    9. Any recovery or award of damages against Thomas Ptak, deceased, is limited by Illinois law. 735 ILCS 5/13-209(b)(2).

### JURY DEMAND

Defendant City demands a trial by jury.

Dated: September 9, 2025

Respectfully submitted

/s/David A. Brueggen
DAVID A. BRUEGGEN, Atty No. 6289138
*One of the Attorneys for the City of Chicago*

James G. Sotos
Josh M. Engquist
David A. Brueggen
Andrew X. Leuchtmann
The Sotos Law Firm, P.C.
141 W. Jackson Blvd., Suite 1240A
Chicago, Illinois 60604
(630) 735-3300
dbrueggen@jsotoslaw.com